In re COAST TRADING COMPANY, INC., Debtor.

Harold CLAYTON, dba Clayton Grain Co., Plaintiff,

v.

COAST TRADING COMPANY, INC.; the Oregon Bank; the Bank of Nova Scotia; Louis Dreyfus Corporation, a corporation; Albers Milling Co., a corporation; North Pacific Grain Growers Co., a corporation; Cargill, Inc., a corporation; and Fisher Mills, Inc., a corporation, Defendants.

Bankruptcy No. 382–00974.
Adv. No. 82–0422.

United States Bankruptcy Court,
D. Oregon.

June 16, 1983.

Howard Levine, Portland, Or., for Oregon Bank.

James Ray Streinz, Portland, Or., for plaintiff.

Kevin Padrick, Portland, Or., for Bank of Nova Scotia.

Leon Simson, Portland, Or., for trustee.

Anne Klassner, Portland, Or., for debtor.

## FINDINGS AND CONCLUSIONS

FOLGER JOHNSON, Bankruptcy Judge.

In March, 1982, Coast Trading Company, Inc. (Coast) entered into contracts with plaintiff to buy white wheat from plaintiff F.O.B. destination. All wheat was shipped by rail before April 7, which was the date Coast filed its Chapter 11 petition. Two cars arrived on the 7th, but there has been no proof that they arrived after the filing of the Chapter 11. The other cars were delivered between April 8 and April 12 before receipt of plaintiff's written reclamation demand on April 12. Coast had resold the grain before shipment, and delivery was not to Coast but to the third party purchasers designated by Coast.

This Court has already held in other cases involving Coast that the seller loses a right to both the grain and the proceeds where it has been resold and delivered to a good faith purchaser in the ordinary course of business before receipt by Coast of the reclamation demand. Since all shipments fall into this category, plaintiff may not follow the grain, and the complaint has been dis-missed as to all such purchasers. It is also conceded that plaintiff is merely a general creditor of Coast as to those shipments delivered before the filing of the Chapter 11.

Plaintiff seeks, however, an administrative priority for those shipments delivered after April 7 on the ground that post-petition delivery created a post-petition debt. If Coast had elected, as a debtor-in-possession, to affirm the contract and thereby induced plaintiff after the filing of the Chapter 11 to ship the wheat, it would have been a post-petition debt entitling plaintiff at least to an administrative priority. It was merely happenstance, however, that it was a post-petition delivery because of the time it took the railroad. Both plaintiff and defendant Coast intended an earlier delivery and do not appear to have had immediate knowledge of delivery. Plaintiff may therefore have been unaware of the possibility of stopping the shipments in transit, and Coast may have had no adequate opportunity to reject the contract nor thought any specific reaffirmation appropriate if such contract was still executory. Coast had resold to third parties, most of whom had paid some 90% of the purchase price to Coast before delivery. The filing of the Chapter 11 prevented Coast, in turn, from paying plaintiff.

Thomas Clayton, manager of plaintiff, described his usual practice in dealing with Coast. When he starts to load a car he calls Coast which gives him a destination for the car. The car is sealed, and the bill of lading with estimated weight is sent to Coast. He expects a 90% advance within a week of shipment based on the estimated weight. The other 10% with adjustments is paid on final settlement which could be from two weeks to six months later. Where shipments are F.O.B. destination, Clayton is responsible for inspection fees and freight charges, but these are matters of final settlement and neither they nor an unexercised right of stoppage in transit create an executory contract where one would otherwise no longer exist.

Donald Kramer of Continental Grain, which also trades under the rules of the Portland Grain Exchange, testified that the party who has the bill of lading has the

right to resell, not only before delivery, but even before the 90% payment is made to the party who sold the grain to them.

Thus receipt of the bill of lading becomes the key factor. Under the Portland Grain Exchange rules the sale takes place at that time, and the buyer becomes immediately obligated to pay 90% of the estimated price to the seller. All bills of lading in this case were delivered to Coast or its designee prior to April 7, and only the intervening Chapter 11 prevented Coast from paying. The sale had taken place before the 7th, and it is immaterial that delivery and payment or final settlement might not occur until a later date. This was not a post-petition transaction between plaintiff and Coast, and plaintiff is not entitled to an administrative priority.

Even if the case was not decided on this last issue which was raised in recent reargument, the Court would still have to deny plaintiff an administrative priority. To be a post-petition obligation of the debtor-in-possession, the contract must still have been executory when the Chapter 11 was filed, and it must have been reaffirmed by the debtor-in-possession. Such reaffirmation normally needs the approval of the Court.

Some cases have held that if a debtor-in-possession accepts the benefits of a pre-petition contract, the debtor-in-possession will be deemed to have accepted the contract. In such a situation, however, priority should be limited to the benefit received, not to the entire contract price. Coast had resold the grain and received 90% of the price of most carloads before the Chapter 11. It is doubtful what benefit would accrue to Coast in reaffirming the entire obligation to plaintiff when there was so little still owed Coast. At the time neither party considered the possibility of an executory contract needing reaffirmation by a debtor-in-possession or that this might result in a post-petition transaction. There was no intent to make it such.

It would be absurd in a huge operation like Coast's, scattered over several states, to hold that Coast would have to examine and apply to the Court for rejection of a large number of almost fully executed contracts before delivery of the grain within less than a week after the filing of the Chapter 11 or be forever deemed to have accepted the contract. This would be impossible and inequitable.

In the case of *Union Leasing Co. v. Peninsula Gunite, Inc.,* 24 B.R. 593, 10 BCD 80 (Bkrtcy.App.R. 9th Cir.1982), the bankruptcy appellate panel stated:

"We perceive no meaningful difference between § 64(a)(1) of the former Bankruptcy Act and 11 USC § 503(b)(1)(A) of the Bankruptcy Reform Act of 1978. Each section allows a priority to the actual and necessary costs and expenses of preserving the estate subsequent to the commencement of the case. Therefore, the body of law that grew up interpreting § 64(a)(1) has value as precedent in interpreting 11 USC § 503(b)(1)(A)." Id. at 80.

In the case of *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976), the court stated the following:

"We begin with the premise that the theme of the Bankruptcy Act is 'equality of distribution.' 'If one claimant is to be preferred over others, the purpose should be clear from the statute.' *Nathanson v. NLRB,* 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952); *see Sampsell v. Imperial Paper Corp.,* 313 U.S. 215, 219, 61 S.Ct. 904 [907], 85 L.Ed. 1293 (1941). To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer." Id. at 953.

Section 503(b)(1)(A) has as its purpose the goal of inducing a creditor to do business with the debtor-in-possession. The facts of the *Clayton* case (and the *Collingwood v. Coast Trading Company Inc.,* 31 B.R. 677 case) show that the plaintiff was induced to do business with the debtor and not the debtor-in-possession.

"Congress recognized that, if a business is to be reorganized, third parties must be willing to provide the necessary goods and services. Since they clearly will not do so unless their claims for payment will

be paid ahead of the pre-petition debts and liabilities of the debtor, § 64(a)(1) provides a priority for expenses incurred by the debtor-in-possession in order to maintain, preserve, or rehabilitate the bankrupt estate.

\*   \*   \*   \*   \*   \*

"For a claim in its entirety to be entitled to first priority under § 64(a)(1), the debt must arise from a transaction with the debtor-in-possession. When the claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.

\*   \*   \*   \*   \*   \*

"It is only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the debtor—give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration." *In Re Mammoth Mart, Inc., supra* at pg. 954.

In the recent case of *In re Baths International, Inc.,* 25 B.R. 538 (Bkrtcy.S.D.N.Y. Dec. 1982), debtor had placed ads to appear in the Yellow Pages. The closing date for placing or deleting ads occurred before debtor filed its Chapter 11, but the directories were not published until after such filing. Judge Galgay held that performance was rendered to a pre-petition company, not to the debtor-in-possession, and denied claimant an administrative priority. He found a dual standard to exist. Not only must the debt be incurred by the debtor-in-possession, it must also be beneficial to the estate of the debtor-in-possession.

It is also doubtful that the contract was still executory. When Clayton loaded, sealed, and delivered the cars to the railroad for shipment and sent the bill of lading to Coast or its designee, Clayton had fully performed the contract except for a few cost adjustments to be made before or at final settlement, long after sale. The fact that Clayton was to pay the freight charges or the cost of inspecting the grain was not a condition precedent to sale. Coast's right to reject the entire carload if it failed to meet certain standards and Clayton's right to stop the car in transit upon Coast's insolvency are conditions subsequent only, and the existence of such rights does not affect completion of the sale.

The lien of The Oregon Bank attached to the grain upon delivery. Even though delivered at Coast's request directly to a third party purchaser, it was a sale from Clayton to Coast, and at the moment title passed through Coast to the ultimate purchaser, the security interest of The Oregon Bank attached as a good faith purchaser in the ordinary course of business. Later, while that interest still continued, The Bank of Nova Scotia was granted a subordinate interest by the Court in the same assets.

Set off of the $4,021.88 owed by Clayton to Coast is, of course, permissible against monies owed by Coast for pre-petition deliveries of grain by Clayton to Coast.

Judgment should therefore be entered for defendants.